[Cite as *State v. Richter*, 2026-Ohio-2687.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO


STATE OF OHIO

        Plaintiff - Appellee

-vs-

RYAN JAMES RICHTER

        Defendant - Appellant

Case No. 2025 CA 00091

Opinion And Judgment Entry

Appeal from the Stark County Court of Common Pleas, Case No. 2025 CR 0690

Judgment:  Affirmed

Date of Judgment Entry: July 13, 2026


BEFORE:   William B. Hoffman, Robert G. Montgomery, and Kevin W. Popham, Judges

APPEARANCES: Kyle Stone, Kameisha J. Johnson, for Plaintiff-Appellee; D. Coleman Bond, for Defendant-Appellant


OPINION

*Popham, J.,*

{¶1}   Appellant Ryan Richter ("Richter") appeals his conviction and sentence after a jury trial in the Court of Common Pleas for Stark County, Ohio. For the reasons that follow, we affirm.

**Facts and Procedural History**

{¶2}   The Stark County Grand Jury indicted Richter on one count of robbery, a felony of the second degree, in violation of R.C. 2911.02(A)(1) and (B).

{¶3}   The charge arose from events occurring on February 21, 2025.

**February 21, 2025: The Robbery**

{¶4} Vapor Town is a smoke and vape shop located near Easton Street NE and Middlebranch Avenue NE in Canton, Ohio, which sells cigarettes, vaping products, tobacco products, water pipes, and THCA products. A.M. was employed by Vapor Town and was responsible for operating the cash register, handling money, and assisting customers.

{¶5} On February 21, 2025, at approximately 8:30 p.m., A.M. was working at Vapor Town when a customer entered the store. The customer's face was concealed by a mask and hood, preventing A.M. from identifying him. Although she noticed a tattoo on the individual's hand, she was unable to discern its details. (1Tr. 103, 120).

{¶6} According to A.M.'s testimony, the customer requested an entire carton of Seneca Red cigarettes, a brand she described as uncommon. Because she was uncertain of the price, she called her manager for verification. While speaking with her manager, A.M. placed the carton on the counter beside her and kept her hand on it. When the call ended, the customer reached across the counter and grabbed the carton. A.M. observed that the customer appeared to have an object in his pocket while taking the cigarettes, although she could not clearly see what it was at that time. (1Tr. 106-107).

{¶7} The customer then left the store (with the cigarettes) without paying. A.M. testified that Vapor Town maintained approximately fifteen surveillance cameras that recorded both the interior and exterior of the premises.

{¶8} A.M. testified that she contacted her employer and then the Stark County Sheriff's Office. When deputies arrived, she provided a statement and showed them the surveillance footage.

{¶9} A.M. testified that after the incident her manager shared the surveillance footage in a group chat. (1Tr. 107). Upon reviewing the video, A.M. believed that an object partially removed from the suspect's pocket appeared to be a firearm. (1Tr. 108). She acknowledged, however, that the object was never fully removed from the pocket and that she did not independently identify it as a firearm; rather, someone else informed her that it appeared to be one. (1Tr. 118). A.M. identified State's Exhibit 1.1 as the surveillance video depicting the incident inside the store.

{¶10} For several weeks following the incident, A.M. neither received updates regarding the investigation nor observed any suspicious individuals enter the store. She was not present at the store on March 16, 2025. On that date, however, a coworker shared surveillance footage in the group chat showing an individual whom employees believed might be the same person involved in the February robbery. A.M. testified that she contacted law enforcement while traveling to the store, but the individual had left before she arrived.

{¶11} After reviewing the March 16 surveillance footage, A.M. observed that the individual was not wearing a mask or hood. Although she could not identify his face as that of the February suspect, she recognized a distinctive tattoo. A.M. testified that the tattoo appeared similar to the one she observed on the robber's hand during the February 21 incident. She described the tattoo as blackwork with a skeletal appearance. (1Tr. 128).

{¶12} A.M. testified that she informed law enforcement that the individual shown in the March 16 video might be the same person involved in the February robbery. (1Tr. 113). Nevertheless, she testified that she could not identify Richter in court as the individual who robbed the store on February 21, 2025. (1Tr. 127).

**March 16, 2025: The Suspect Returns**

**{¶13}** C.R., another Vapor Town employee, testified that Richter entered the store on March 16, 2025, and purchased two packs of Seneca Kings cigarettes using a debit card.

**{¶14}** After Richter left, coworkers informed C.R. about the prior robbery. She reviewed surveillance footage from both incidents and specifically looked for identifying characteristics. (1Tr. 136). C.R. identified Richter in court as the individual who entered the store on March 16. (1Tr. 134). She also identified State's Exhibit 3 as the receipt documenting Richter's purchase on that day.

**{¶15}** C.R. testified that she observed distinctive features within the hand tattoo, including outlining, finger tattooing, and areas of white spacing. (1 Tr. 142). Although she could not identify the precise image depicted by the tattoo, she recognized a particular black-and-white pattern. (1Tr. 143).

**{¶16}** After comparing the videos, C.R. testified that she believed the robbery suspect could possibly be Richter because the tattoos appeared similar. (1Tr. 137).

**The Investigation**

**Initial Response to the Robbery**

**{¶17}** Sergeant Derek Little of the Stark County Sheriff's Office testified that he was on duty on February 21, 2025, when officers were dispatched to Vapor Town regarding a reported theft. Because he was nearby, he responded to the scene hoping to locate the suspect shortly after the incident.

**{¶18}** Upon arrival, Sergeant Little found no one outside the business. He spoke with the store employee who reported the incident and reviewed the available information. The following day, he directed deputies to canvass nearby businesses and surrounding

neighborhoods to determine whether anyone had observed the suspect leaving in a vehicle or on foot. Despite those efforts, investigators were unable to identify a suspect.

**Reopening the Investigation following March 16, 2025**

{¶19} Several weeks later, employees of Vapor Town contacted law enforcement after observing an individual they believed might be the same person involved in the February 21 robbery. Deputies responded to the store and reviewed surveillance footage of the individual's visit on March 16, 2025.

{¶20} Investigators identified a vehicle associated with the individual as a 2005 Toyota Highlander. Through law-enforcement databases, officers obtained vehicle-registration information and a photograph of Ryan Richter. Investigators also reviewed a receipt generated during the March 16 transaction, which reflected the name "Ryan Richter" as the purchaser.

**Contact with Richter**

{¶21} On March 21, 2025, Sergeant Little and other deputies went to an apartment complex on Edelweiss Avenue in Plain Township, Stark County, Ohio. Officers learned that Richter resided there with his brother and sister-in-law. Deputies also located, at the residence, the Toyota Highlander associated with the investigation.

{¶22} According to Sergeant Little, the location of the residence generally corresponded with the direction the robbery suspect appeared to travel after leaving Vapor Town on February 21.

{¶23} When deputies contacted Richter, Sergeant Little observed that he was wearing an Under Armour hoodie with gray-and-black camouflage sleeves and a camouflage hood. (1Tr. 173). Sergeant Little testified that the sweatshirt resembled the one worn by the

individual depicted in the surveillance footage. He further observed that Richter had hand tattoos similar to those visible in the video. According to Sergeant Little, the tattoos extended across the fingers, knuckles, and backs of the hands. He also testified that Richter's height, build, and eyeglasses appeared consistent with those of the individual shown in the surveillance footage. (1Tr. 173-174).

**Arrest and Search of the Residence**

**{¶24}** On March 26, 2025, deputies returned to the residence to execute an arrest warrant for Richter. Before conducting a search of the basement area where Richter slept, officers spoke with Richter's brother regarding firearms in the home. Richter's brother produced two black semiautomatic pistols that he and his wife legally owned.

**{¶25}** Sergeant Little testified that he obtained permission to search the area occupied by Richter. In the basement, officers observed laundry baskets containing clothing which Detective McCollister recovered. According to Sergeant Little, an Under Armour hooded sweatshirt with gray-and-black camouflage sleeves and a camouflage hood - recovered from the scene by Detective McCollister - resembled both the one worn by the robbery suspect and the one Richter wore when officers contacted him on March 21. (1Tr. 178).

**{¶26}** Sergeant Little further testified that Richter was wearing shoes similar to those visible in the surveillance footage when he was arrested.

**{¶27}** Based on nearly twenty years of law-enforcement experience and annual firearms training involving pistols, rifles, and shotguns, Sergeant Little testified that the object visible in the robbery video appeared to be a semiautomatic pistol. Although he could not identify a specific make or model, he based his opinion on his training and experience.

**Detective McCollister's Investigation**

**{¶28}** Detective McCollister testified that he became involved after learning that a firearm had allegedly been displayed during the theft. During his investigation, he learned that an individual believed to be the robbery suspect later returned to Vapor Town and purchased cigarettes using a credit card. Investigators obtained the receipt from that transaction, which identified the purchaser as Ryan Richter. (1Tr. 207).

**{¶29}** After reviewing the surveillance footage, Detective McCollister described the suspect as wearing black running pants, a black Under Armour hooded sweatshirt with camouflage sleeves, and black shoes with white soles. He estimated the suspect's height to be between 5'9" and 6'0". Detective McCollister further testified that the video appeared to show a black semiautomatic handgun partially protruding from the suspect's pocket. Although familiar with firearms, he acknowledged that the video did not provide enough detail to identify a specific make or model. (1Tr. 205).

**{¶30}** Following Richter's arrest, Detective McCollister searched the basement area where Richter slept. Inside a laundry hamper, he located an Under Armour hooded sweatshirt consistent with the clothing visible in the surveillance footage. He also documented two handguns belonging to Richter's relatives by recording their serial numbers and photographing them.

**{¶31}** Detective McCollister further testified that Richter was wearing black athletic shoes with white soles and a white stain on the top of the left shoe when he was arrested. According to the detective, the shoes appeared similar to those worn by the individual depicted in the robbery video. He also testified that Richter's hand tattoos appeared consistent with those visible in the surveillance footage. (1Tr. 216).

**Alternative Suspects Considered**

{¶32} On cross-examination, Detective McCollister acknowledged that investigators discussed another potential suspect named Michael, who also had hand tattoos. (1Tr. 227). Detective McCollister testified that he was familiar with Michael from a prior traffic stop and described him as a thin individual. (1Tr. 229, 231).

{¶33} Detective McCollister further acknowledged that officers discussed another individual named Cody during the investigation. According to the detective, Cody was eliminated as a suspect because his physical stature did not match that of the individual depicted in the surveillance footage. (1Tr. 244). Detective McCollister testified that he never personally interviewed Cody.

**The Defense Case**

{¶34} Deputy Alin Moga of the Stark County Sheriff's Office was called as a defense witness. Deputy Moga testified that he did not recall going into an apartment and showing anyone a picture of a potential suspect in this case. (1Tr. at 261).

**Verdict and Sentence**

{¶35} The jury found Richter guilty of robbery. The trial court sentenced Richter to an indefinite prison term with a minimum sentence of 5 years and a potential maximum term of 7.5 years.

**Assignments of Error**

{¶36} Richter raises two assignments of error for our consideration:

{¶37} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTIONS MUST BE REVERSED."

**{¶38}** "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AND MUST BE REVERSED."

I.

**{¶39}** In his first assignment of error, Richter specifically contends that the State did not present sufficient evidence that he had a deadly weapon on or about his person or under his control while committing a theft offense. (Appellant's brief at 23). We disagree.

**Standard of Review**

**Sufficiency of the Evidence**

**{¶40}** A challenge to the sufficiency of the evidence presents a question of law that we review de novo. *State v. Walker*, 2016-Ohio-8295, ¶ 30. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶41}** A conviction will be reversed for insufficient evidence only where reasonable minds could reach but one conclusion, acquittal. *State v. Ketterer*, 2006-Ohio-5283, ¶ 94.

**Governing Law**

**{¶42}** Richter argues that the State failed to prove he had a deadly weapon on or about his person or under his control during the commission of the offense. He emphasizes that no firearm was recovered from him, that not even a toy gun was discovered during the investigation, and that the store clerk did not observe a firearm during the theft. He further contends that there was no evidence he displayed, brandished, or otherwise used a firearm in a threatening manner.

**{¶43}** For purposes of R.C. 2911.02(A)(1), a "deadly weapon" includes "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). A firearm is a deadly weapon. R.C. 2923.11(B). A handgun is a firearm. R.C. 2923.11(C).

**{¶44}** The Supreme Court of Ohio has held that even an unloaded firearm may constitute a deadly weapon for purposes of a robbery-related offense. *State v. Vondenberg*, 61 Ohio St.2d 285 (1980), syllabus. Likewise, Ohio courts have recognized that a toy gun may qualify as a deadly weapon because it is capable of inflicting serious harm when used as a bludgeon. *State v. Lloyd*, 2015-Ohio-2052, ¶ 12 (5th Dist.), citing *State v. Hicks*, 14 Ohio App.3d 25, 26 (8th Dist. 1984).

**{¶45}** More importantly, Richter was convicted of robbery under R.C. 2911.02(A)(1), not aggravated robbery. Consequently, the State was not required to prove that he displayed, brandished, indicated possession of, or used the weapon during the commission of the offense. See *State v. Miller*, 2024-Ohio-3182, ¶ 15 (5th Dist.). Rather, the statute requires only proof that the offender had a deadly weapon on or about his person or under his control while committing the theft offense. Nothing in the statute requires that a witness observe the weapon.

**{¶46}** Applying these principles to the present case, both Sergeant Little and Detective McCollister testified that, based upon their training, experience, and familiarity with firearms, the object visible in the surveillance footage appeared to be a black semiautomatic handgun. (1Tr. 164-165, 205). Although neither witness could identify a specific make or model, both testified that the object was consistent with a semiautomatic pistol.

**{¶47}** When viewed in the light most favorable to the State, this testimony constituted evidence from which a rational trier of fact could conclude that Richter possessed a deadly weapon on or about his person or under his control during the commission of the theft offense. The fact that no firearm was ultimately recovered affects the weight of the evidence rather than its legal sufficiency.

**{¶48}** Accordingly, sufficient evidence supported Richter's conviction for robbery under R.C. 2911.02(A)(1).

**{¶49}** Richter's first assignment of error is overruled.

II.

**{¶50}** In his second assignment of error, Richter specifically contends that no witness could conclusively identify him as the individual who committed the robbery and that the State's case rested entirely upon contradictory circumstantial evidence. We disagree.

**Standard of Review**

**Manifest Weight of the Evidence**

**{¶51}** A manifest-weight challenge concerns the persuasive force of the evidence. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. The relevant inquiry is whether the greater amount of credible evidence supports one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶52}** In conducting a manifest-weight review, an appellate court sits as a "thirteenth juror" and independently reviews the entire record, weighs the evidence and all reasonable inferences, considers witness credibility, and determines whether the jury clearly lost its way and created a manifest miscarriage of justice. *State v. Jordan*, 2023-Ohio-3800, ¶ 17; *Thompkins*

at 387. Reversal on manifest-weight grounds is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Thompkins* at 387.

{¶53} Even so, substantial deference is afforded to the factfinder's credibility determinations. Because the jury personally observes the witnesses' demeanor, voice inflections, and manner of testifying, it is in the best position to evaluate credibility. *Eastley* at ¶ 21; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶54} Additionally, the Ohio Constitution requires the unanimous concurrence of all three appellate judges before a conviction may be reversed as against the manifest weight of the evidence. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4.

**Application**

{¶55} Richter's argument focuses primarily on identity. Although no witness made an unequivocal in-court identification of Richter as the individual who committed the robbery, the State presented substantial circumstantial evidence linking him to the offense.

{¶56} The jury heard testimony from A.M., who observed a distinctive hand tattoo on the robber during the February 21, 2025, incident. Although A.M. could not identify Richter as the robber, she testified that after reviewing surveillance footage from March 16, 2025, she recognized that the tattoo visible on Richter appeared similar to the tattoo she observed on the robber's hand.

{¶57} Likewise, C.R. reviewed surveillance footage from both incidents and testified that she observed similar identifying characteristics in the hand tattoos. She described the tattoo as distinctive because of its placement and its black-and-white patterning. Based upon

her observations, she believed the individual who returned to the store on March 16 could be the same person involved in the robbery.

**{¶58}** The jury also heard testimony from Sergeant Little, who personally observed Richter during the investigation. Sergeant Little testified that Richter's hand tattoos appeared consistent with those visible in the surveillance footage. He further testified that Richter's build, eyeglasses, and clothing resembled those of the robbery suspect. Additionally, officers recovered an Under Armour sweatshirt matching the description of the clothing worn by the suspect from the area of the residence occupied by Richter.

**{¶59}** Beyond the witness testimony, the jury was able to view the surveillance videos for itself. The jurors were therefore not required to rely solely upon witness descriptions but could independently compare the suspect depicted in the footage with the evidence presented at trial.

**{¶60}** To be sure, the defense highlighted weaknesses in the State's case. No witness positively identified Richter as the robber, and the investigation considered other individuals during its early stages. The jury was fully aware of those facts. Nevertheless, the existence of conflicting evidence does not render a conviction against the manifest weight of the evidence. Rather, it is the jury's role to resolve conflicts in the testimony and determine what weight to assign to the evidence presented.

**{¶61}** "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks* 61 Ohio St.3d 259, 272 (1991). Moreover, "the law makes no distinction between direct and circumstantial evidence but simply requires that the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case including such reasonable

inferences as seem justified, in light of [the juror's] own experience." *State v. Emerick,* 1997 Ohio App. LEXIS 2491, *32 (2nd Dist. Jun. 6, 1997).

{¶62} As the trier of fact, the jury was free to believe all, part, or none of any witness's testimony. *State v. Petty*, 2017-Ohio-1062, ¶ 63 (10th Dist.), quoting *State v. Mullins*, 2016-Ohio-8347, ¶ 39 (10th Dist.). Moreover, where the evidence permits competing reasonable interpretations, an appellate court may not substitute its judgment for that of the jury merely because it might have reached a different conclusion. *State v. Dyke*, 2002-Ohio-1152, ¶ 13 (7th Dist.).

{¶63} After independently reviewing the entire record, we cannot conclude that the jury clearly lost its way or created a manifest miscarriage of justice. The State presented evidence linking Richter to the robbery through the distinctive hand tattoos, his physical appearance, his clothing, and his subsequent return to the store. The jury was entitled to credit that evidence and reject the defense's alternative explanations.

{¶64} Nor is this the exceptional case in which the evidence weighs heavily against conviction. Although the State's case was largely circumstantial, circumstantial evidence possesses the same probative value as direct evidence. *Jenks.*

**Conclusion**

{¶65} Upon reviewing the entire record and weighing the evidence and all reasonable inferences, we conclude that the jury did not clearly lose its way or create a manifest miscarriage of justice. Richter's robbery conviction is not against the manifest weight of the evidence.

{¶66} Accordingly, Richter's second assignment of error is overruled.

**{¶67}** For the reasons stated in this Opinion, the judgment of the Court of Common Pleas for Stark County, Ohio is affirmed.  Costs to be paid by appellant Ryan Richter.

By: Popham, J.

Hoffman, P.J. and

Montgomery, J., concur